523 F.2d 1301
 Vilma E. GRANT, Executrix of the Estate of Benjamin W.
Grant, Plaintiff-Appellant,
v.
BILL WALKER PONTIAC-GMC, INC., Defendant-Appellee.
C. E. K. HOGAN and Deep Woods Camp for Boys, Inc.,
Defendants-Third-Party Plaintiffs-Appellants,
v.
FIREMAN'S FUND INSURANCE CO., Third-Party Defendant-Appellee.
 Nos. 74-2335, 74-2336.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 15, 1975.
Decided Sept. 30, 1975.
 
 Carl L. Wedekind, Jr., Stites, McElwain & Fowler, Louisville, Ky., for plaintiff-appellant and third-party defendant-appellee.
 John G. Crutchfield, Ewen, Mackenzie & Peden, Louisville, Ky., for defendant-appellee and third-party defendant-appellee.
 J. L. Richardson, Jr., Richardson & Richardson, Louisville, Ky., for C. E. K. Hogan and Deep Woods Camp for Boys.
 Before PHILLIPS, Chief Judge, and EDWARDS and ENGEL, Circuit Judges.
 ENGEL, Circuit Judge.
 
 
 1
 These are appeals from a summary judgment dismissing from a wrongful death action Bill Walker Pontiac-GMC, Inc., and his insurer the Fireman's Fund Insurance Company. The trial judge held that neither Walker nor his liability insurer were vicariously liable by reason of any relationship of Walker to either the driver or to the truck which was involved in the fatal accident. We affirm.
 
 
 2
 C. E. K. Hogan was the proprietor of Deep Woods Camp for Boys, Incorporated, which he operated in Brevard, North Carolina. Deep Woods was a North Carolina corporation and Hogan was a citizen of that state. In March 1972, while on a recruiting trip to Georgia, Hogan visited Bill Walker, president and sole stockholder of Bill Walker Pontiac in Brunswick, Georgia. The two were boyhood friends and they discussed at that time Hogan's expected need of a new truck for the boys' camp. On May 23, 1972, Hogan called Walker from Brevard and sought Walker's advice upon the type of truck he should buy. The two agreed upon a suitable type of truck meeting Hogan's specifications. Walker subsequently searched for such a truck through the General Motors locating system, since Walker himself did not have one in stock. Two were found, one in Lakeland, Florida and one at the General Motors factory at Pontiac, Michigan. After a further telephone call, it was agreed that Hogan would buy the truck in Pontiac since it was cheaper and he could further save an additional $200 if he picked it up himself at the factory. Accordingly, Walker made the necessary telephone calls to GM in Detroit and reserved a GMC two-ton truck for Walker. General Motor's sales price was charged to Walker's account.
 
 
 3
 By telephone Hogan and Walker agreed upon a price, and preliminary clearance was obtained through GMAC for Hogan's financing the balance after an agreed down payment. On the same day the sales manager of Bill Walker Pontiac wrote a letter of confirmation to Hogan and enclosed the preliminary billing and GMAC contract with instructions for Hogan to sign and return the same.
 
 
 4
 Since Hogan was himself to pick up the truck and would be driving it back to North Carolina and not to Georgia, he would not be able to use dealer's plates. Consequently Walker advised Hogan that he should use the plates from an old truck which the boys' camp owned and which was to be retired by the new truck in any event. Hogan flew to Detroit and on the morning of May 24 presented himself to the General Motors Fleet Carrier office in Detroit to pick up the truck. Since General Motors would not sell directly to a customer, it insisted that if Hogan was to pick up the truck, he must do so as agent for Walker Pontiac, an authorized dealer. Further telephone calls between Walker Pontiac and General Motors accomplished this result and at about 1 o'clock that afternoon the truck was released to Hogan with a gate pass, and Hogan in turn signed a receipt for the truck as agent for Walker Pontiac. A certificate of origin was to be sent later to Walker Pontiac which would then be transmitted, probably to the GMAC office near Hogan in North Carolina, which in turn would present it for the issuance by appropriate North Carolina authorities for a certificate of registration in that state.
 
 
 5
 The accident which took the life of plaintiff's decedent occurred in the early morning of May 25, 1972 on I-75 in Rock Castle County, Kentucky as Hogan was driving the truck home to North Carolina. Hogan apparently fell asleep at the wheel. He has admitted his liability for the death.
 
 
 6
 Plaintiff commenced this diversity action in the United States District Court for the Western District of Kentucky, originally naming as defendants Hogan, the Deep Woods Boys Camp, Inc., General Motors, GMAC and Bill Walker Pontiac. The earlier dismissal of General Motors and GMAC has not been appealed. The complaint sought damages for the wrongful death of plaintiff's decedent and also a declaratory judgment to adjudicate the ownership of the truck at the time of the accident. The complaint alleged that at the time of the accident Hogan was acting "as the duly authorized agent, servant or employee of one or more of these said defendants". Thereafter Hogan and the Deep Woods Camp filed in the district court a third-party complaint against Fireman's Fund Insurance Company as liability insurer of Bill Walker Pontiac, seeking a declaration that Deep Woods and Hogan were covered by Bill Walker Pontiac's insurance policy and asking for indemnification from their potential liability to plaintiff to the extent of the coverage under the policy.
 
 
 7
 Cross motions for summary judgment raised the issues of ownership of the truck driven by Hogan and of the vicarious liability of Walker Pontiac and Fireman's Fund.
 
 
 8
 In a memorandum opinion, District Judge Rhodes Bratcher ruled that Kentucky law applied and that under the Kentucky law, particularly the Kentucky Uniform Commercial Code, KRS 355.2-401, Hogan was considered the owner of the truck at the time of the accident. Judge Bratcher further held that having taken delivery of the truck in Pontiac, Hogan, under Kentucky law, must be deemed to have been acting on his own behalf and for his own benefit and that "There is no showing of agency between the seller Walker and the customer Hogan".
 
 
 9
 Judge Bratcher also ruled that the result would be no different even if, as urged by appellants, the law of North Carolina were applicable to decide the question of ownership of the truck.
 
 
 10
 Since in a diversity action a federal district court sits as a state trial court, Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the district court here correctly concluded that Kentucky's conflict of laws rules would apply. While Kentucky purports at least to follow the significant contacts rule in determining which law to apply, see Foster v. Leggett, 484 S.W.2d 827 (Ky.1972), we think it clear that the district judge was correct in concluding that "Kentucky strongly favors the application of its own law when it is the forum whenever it can be justified".
 
 
 11
 An analysis of the significant contacts favors the application of Kentucky law: The accident occurred in Kentucky, the forum is in Kentucky and plaintiff's decedent was a citizen and resident of Kentucky at the time of his demise.
 
 
 12
 With respect to the vicarious liability of third parties, appellants take issue with the district court's ruling that Kentucky law should govern the question of whether Hogan was the owner of the truck at the time of the accident. They point to the Section 355.1-105(1) of Kentucky's Uniform Code which provides:
 
 
 13
 "Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this chapter applies to transactions bearing an appropriate relation to this state."
 
 
 14
 Arguing that the transaction whereby Hogan was to purchase the truck from Walker bore a "reasonable relation only to the State of North Carolina, and none whatever to the State of Kentucky", appellants urge that the law of North Carolina, therefore, governs the question of ownership (see Big Four Mills v. Commercial Credit Co., 307 Ky. 612, 211 S.W.2d 831 (1948)) and that under North Carolina law, title to the truck would not have passed to Hogan or the boys' camp until there had been full compliance with North Carolina's vehicle registration statutes.
 
 
 15
 Even were we to assume that appellants are correct in their assertion that, with respect to the passage of title, North Carolina law was applicable and that under North Carolina law title to the vehicle would not have passed to Hogan or the boys' camp, we agree with the district judge that this circumstance would not be sufficient to impose liability upon Bill Walker Pontiac. In any event the question of vicarious liability for the torts of another would, nevertheless, be governed by the law of Kentucky. So much seems implicit in the acknowledgment by all parties that the issue of agency between Hogan and Walker must be decided under Kentucky law. See also McClure v. United States Lines Co., 368 F.2d 197 (4th Cir. 1966); Restatement of Law 2d, Conflicts of Law 2d § 174.
 
 
 16
 Consequently before it is necessary to determine the issue of ownership of the truck, a preliminary question is whether ownership alone in Kentucky is sufficient to charge one with vicarious liability. We need only refer to the case of Wolford v. Scott Nickels Bus Co., 257 S.W.2d 594, 595 (Ky.1953), wherein the court states: "Liability for damages arising from the operation of a motor vehicle must rest on something more than mere ownership. Where the vehicle is operated by a person other than the owner, the relationship of master and servant or principal and agent is necessary to establish liability on the owner". Accord Johnson-Kitchens Ford Corp. v. Shifflett, 462 S.W.2d 430 (Ky.1970). We note also that Kentucky has not enacted an owner liability statute which would automatically impose liability upon the owner of a motor vehicle for the negligent acts of the operator.[1]
 
 
 17
 Instead, vicarious liability in Kentucky is based upon traditional common law concepts. The only relevant basis here for imposing liability is agency. We, therefore, must look to Kentucky law to determine whether at the time of the accident an agency relationship existed between Hogan or the boys' camp and Bill Walker Pontiac. Under Kentucky law the right to control is considered to be the most critical element in determining whether an agency relationship exists. See Shedd Brown Mfg. Co. v. Tichenor, 257 S.W.2d 894 (Ky.1953); Sam Horne Motor & Implement Co. v. Gregg, 279 S.W.2d 755 (Ky.1955); Marcum v. Hedger, 303 S.W.2d 558 (Ky.1957); American Sav. Life Ins. Co. v. Riplinger, 249 Ky. 8, 60 S.W.2d 115 (1933).
 
 
 18
 There is evidence that Hogan signed the truck out of the Fleet Carrier pool as agent for Bill Walker Pontiac. While it is true that "the mere representations of a claimed agent, even when coupled with signing a paper in such capacity, are not sufficient to show his agency or the extent thereof", Har-Bel Coal v. Asher Coal Mining Co., 414 S.W.2d 128, 130 (Ky.1967), Walker does not deny that Hogan signed as agent upon Walker's express authority conveyed to General Motors and the Fleet Carrier pool by telephone. Therefore, urges Hogan, having been the acknowledged agent of Bill Walker at the time he took possession of the truck, that agency relationship continued to exist at the time of the accident since he was returning the truck to North Carolina pursuant to the agreement of the parties. In this he places great reliance upon Marcum v. Hedger, 303 S.W.2d 558 (Ky.1957). The cases are quite similar on their face in many aspects. In that case, one William Hurley of Sandgap, Kentucky, desired to purchase a used car at an auction sale in Cincinnati. Since only car dealers could bid at the auction, Hurley procured John Marcum, a used car dealer, to go with him. It was agreed that Marcum would buy the car and be responsible for getting it back to Sandgap. Accompanying the two men was Matthew Moore, brother-in-law of Hurley. At the auction Marcum in fact purchased three cars, two for Hurley and one for himself. Moore agreed to drive one of the cars Hurley was buying back to Sandgap. En route Moore was involved in an accident. Both Hurley and Marcum were sued by the injured party. The Kentucky Court of Appeals upheld a judgment against both and approved a trial court instruction to the jury authorizing it to find that at the time of the accident Moore was acting as the agent of the two men. In affirming the judgment, the court held:
 
 
 19
 "However, it is the right to control the details that is the determining factor, and we think that the evidence shows that the parties intended that Moore should take the car where, when and how Marcum and Hurley desired. No directions as to details were given simply because they were not considered necessary." Marcum v. Hedger, supra, 303 S.W.2d at 560.
 
 
 20
 In contrast, while Hogan required the authority of Walker to obtain possession of the truck, this was all the authority that was desired or contemplated by the parties. Once receipt of the truck had been accomplished, any agency relationship between them was inevitably terminated. Contrary to the circumstances in Marcum v. Hedger, supra, here the purchaser himself took over the operation of the truck. While no doubt both Hogan and Walker expected that Hogan intended to return with the truck to North Carolina, neither understood that Walker would have any right to insist that he do so or would retain any other right to control the operation, route or even destination of the vehicle. It is undisputed that Walker had no obligation to pick up the truck or to deliver it to the boys' camp for the parties had expressly agreed to the contrary. Under such circumstances, therefore, we conclude the summary judgment was properly entered by the trial court.
 
 
 21
 Appellant Grant urges that if it were to be determined that Walker Pontiac was the owner of the vehicle at the time of the accident, this would be sufficient to make Hogan as the driver an additional insured under Walker's insurance policy with Fireman's Fund. However, it expressly appears from the language in the policy under Article IV "PERSONS INSURED" that:
 
 
 22
 "None of the following is an insured: . . .
 
 
 23
 (iii) any person or organization other than the named insured with respect to any automobile . . . (b) possession of which has been transferred to another by the named insured pursuant to an agreement of sale."
 
 
 24
 A similar provision was involved in Allstate Insurance Co. v. Napier, 505 S.W.2d 169 (Ky.1974), and was determined to exclude coverage of an employee of a car dealer who was involved in an accident while driving an automobile which he had agreed to purchase from his employer, although there had been no transfer of title. Since the relevant insurance policy was executed in Ohio, the Kentucky Court of Appeals felt itself obligated in that instance to apply Ohio law and specifically the Ohio Uniform Commercial Code. The court held at 171:
 
 
 25
 "The exclusion contained in the policy does not refer to a contract of sale, but rather an agreement of sale. An agreement is defined under the Ohio Revised Code, Section 1301.01(C) as: 'The bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance' . . .."
 
 
 26
 The policy in question here, we conclude, would be determined in the Kentucky courts to be governed by Georgia law, a circumstance which, however, is of no help to plaintiff here since Georgia's Uniform Commercial Code has the identical language. See Georgia Code Annotated 109A-1-201(3).
 
 
 27
 Affirmed.
 
 
 
 [1]
 Neither apparently does North Carolina in any event. See Kline v. Wheels By Kinney, Inc., 464 F.2d 184 (4th Cir. 1972)