**MILLER'S BOTTLED GAS, INC., a Kentucky corporation, Plaintiff–Appellant, Cross–Appellee,**

v.

**BORG-WARNER CORPORATION, a Delaware corporation, Defendant–Appellee, Cross–Appellant.**

**Nos. 93–5281, 93–5313.**

United States Court of Appeals, Sixth Circuit.

Argued June 23, 1994.

Decided June 19, 1995.

Rehearing Denied July 25, 1995.

---

John R. Bush (argued and briefed), Bush, Ross, Gardner, Warren & Rudy, Tampa, FL, Karl N. Crandall, Bowling Green, KY, for plaintiff-appellant cross-appellee.

Philip I. Huddleston, Huddleston Bros., Bowling Green, KY, Hugh N. Smith (argued), David S. Nelson (briefed), Smith & Fuller, Tampa, FL, for defendant-appellee cross-appellant.

Before: JONES, KRUPANSKY, and RYAN, Circuit Judges.

RYAN, Circuit Judge.

Plaintiff, Miller's Bottled Gas, Inc., and defendant, Borg–Warner Corporation, are before this court a second time in a case involving the defendant's sale of defective carburetors to the plaintiff. After this court remanded the case following the first appeal, a jury returned a verdict for the plaintiff on the plaintiff's fraud claim. Both parties appealed. The plaintiff now asks us to determine whether the district court erred in refusing to instruct the jury on punitive dam-

ages. Borg–Warner raises three assignments of error: (1) whether sufficient evidence supports the jury's award of inventory damages; (2) whether sufficient evidence supports the jury's award of interest damages; and (3) whether the district court erred in refusing to instruct the jury on Borg–Warner's agency and joint venture theories.

As to plaintiff's appeal, we conclude that the district court did not err in refusing to instruct the jury on punitive damages. As to Borg–Warner's cross-appeal, we conclude that sufficient evidence supports the jury's award for both inventory and interest damages and that the district court did not err in refusing to instruct the jury on an agency and joint venture theory.

## I.

The facts were thoroughly set forth in the first published opinion. *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.,* 955 F.2d 1043 (6th Cir.1992). We repeat them here with additional facts as necessary.

## A.

In 1975, Roy Johnson, then a Borg–Warner employee, conceived an idea for a dual-fuel carburetor. He produced fourteen hand-built prototypes. According to Johnson, Borg–Warner mounted the prototypes on different vehicles throughout the country in order to gauge the carburetors' performance. Dynamometer tests rated engines equipped with these prototype carburetors high in terms of power and efficiency.

... Overall, according to Johnson, all fourteen carburetors performed ... satisfactorily in field tests conducted all over the United States.... By Johnson's estimate, the carburetors were driven a total of "three quarters of a million miles" during this field testing.

Next, perhaps in 1978, Borg–Warner built experimental "production prototypes" or "under-development" units ... based upon the fourteen prototypes. According to trial witnesses, abbreviated dynamometer tests indicated that the majority of

these units "ran very well." Borg–Warner field-tested these prototypes by installing some of them in Borg–Warner officers' cars. According to former Borg–Warner employees, the corporation continued to test the new carburetor in the laboratory on an ongoing basis.

In late 1979 and early 1980, Borg–Warner manufactured a "pilot run" of the new carburetors. Johnson performed dynamometer tests [sixteen to twenty hours per day] on the pilot run carburetors, which came to be called "[A]cucarbs".... A [Borg–Warner] witness stated "[W]e kind of rushed [the pilot-run [A]cucarbs] onto company cars.... We did this quickly because [the sales department wanted to] get it out there into the marketplace...." [The witness also testified that he believed that] ... one of the pilot-run [A]cucarbs "ran lean and had a huge backfire that caused damage to backfire vent doors and spring."

Borg–Warner Sales Manager [James] Hollingsworth testified that in the last quarter of 1979, he "raised hell with people all the way from the vice president of engineering to the members of the [[A]cucarb development] task force, because I didn't think that they were following Roy Johnson's unit which they kept telling me that they couldn't build in production, they had to make changes." Specifically, Hollingsworth complained:

[T]he typical situation would be that the doors didn't rub on the nylon plate that was installed in the side of his unit and we had air gaps around [the] doors, both sides.... And they had [installed] a washer that you could adjust, but they were not rubbing.... [I]n production they couldn't build them that way and the engineers would have to allow 16th of an inch or whatever for clearance. And my problem naturally was that they won't work if they are drawing air in ..., if you can see daylight it's no good.

A defense witness confirmed that Hollingsworth [communicated these concerns to the company].... According to that witness, "we [Borg–Warner employees] were all aware of the potential air leaks at

two places. The sides of the doors and at the seal right at the shaft, and undoubtedly I discussed that [situation] with Mr. Hollingsworth and many others. . . ." According to another witness, Hollingsworth stated that in approximately the last quarter of 1980 "the Acucarb was untried and uncalibrated as it was released to production, it was not tested and proven enough to be sold."

A former Borg–Warner senior project-engineer testified that . . . the exhausts gas analysis was very limited because Borg–Warner [utilized] "only two working engine dynamometers with limited exhausts gas analysis and limited capabilities to measure fuel flow air flow into the engine." The engineer testified that "the test specifications were very informal and certainly not regimented."

After the carburetor "went through various stages of design" as a result of testing at various stages, Borg–Warner prepared to build the first production units in January 1980. Hollingsworth testified as follows:

> There had been no testing of the units other than the units . . . that were on engineering department vehicles, vice president of engineering, Roy Johnson's car, maybe John Daum's car, but people in the engineering department was the only testing that had been done other than the original prototypes that Roy Johnson built. At that point in time we were faced with we either going to have to go into full test program or we are going to have to start producing units. . . . [Dealers said that] this market is not going to last forever. Under a normal program we would have tested units for anywhere from 90 to 120 days or longer, and they had, normally would have had to have been production units. And at the middle of January, early part of January there had been no production units built. So at that point are we going to run production units on test or are we going to build product and ship it to the customer.

. . . According to one witness, Borg–Warner tested the production units prior to sale by placing one on an employee's car before the employee went for a long drive. Borg–Warner apparently also continued to perform some type of laboratory tests on the [A]cucarb after production and distribution began.

At some point after production began, Borg–Warner placed a gasket between covers of the carburetor to remedy problems caused by air leaks between the top cover and the body joint. Such leaks did not occur in the experimental models, possibly due to a design change that occurred between the experimental and the production designs. Early production units also developed problems with their doors, eventually necessitating the addition of a soft piece of Teflon cloth to the doors.

Several former Borg–Warner employees . . . testified that the design of the production version of the new carburetor differed in several significant respects from the design of the fourteen handcrafted prototypes. The witnesses cited differences in fuel enrichment devices, door construction, door seal, backfire valves, calibrations, linkage, tolerance, weight, material, and top-cover thickness. According to one witness, dimensional changes occurred "as the result of rush production."

Several witnesses testified that the design changes impaired the [A]cucarb's performance. Specifically, a former Borg–Warner employee testified that "[T]he linkage had a lot more friction and there were a lot of tolerance problems associated with the production unit that we did not have with the prototype." Another former employee testified that the "first production models didn't produce the same results in the area of power, acceleration [as the prototypes produced]. . . . [T]he factory production model didn't produce enough CO. You couldn't get enough fuel through it. . . . It ran too lean."

Moreover, one witness stated that due to the design of the [A]cucarb, probably "fewer than twenty men" in the United States knew how to install the carburetor properly. In his view, due to faulty installation and possibly because of thinner material in the production-version cover-plate, the

production units had a "problem of deformation of the top plate and the concomitant [problem] of ... associated bowing and allowance of air leaks." Another witness explained that air leaked because the top steel plate "was a small piece that was stamped out and would have some warps ... so there was no way to put a gasket under [there] and ... it would leak between the top cover and ... moving plate."

### B.

In December 1979, Hollingsworth contacted Glenn Miller of [Miller's Bottled Gas] ... in order to encourage [Miller's] to become an [A]cucarb distributor. Miller described Hollingsworth's sales presentation as follows:

> ... He informed us that [due to] the upturn of the LP gas and motor fuel market and the strong demand for carburetion equipment ... Marvel–Schebler/Tillotson had decided to manufacture their dual fuel conversion system, this being the same carburetion system Mr. Roy Johnson had prototyped in the mid 1970's and that Miller's and Future Fuels did have some knowledge of, through seeing the prototype run on one of the salesman cars who had worked for Century at the time, Mr. Dave Barnes. Mr. Hollingsworth informed us that they had reworked the prototype mixer, that it had been running on various vehicles at the present time, that it would fit any size U.S. made vehicle engine being manufactured at that time from a 200 cubic inch displacement engine up through the 454 and 460 engines, which at the time were the largest production models being manufactured in the United States. He also stated that the power and fuel economy on the Acucarb as it had been made was superior to any other dual fuel carburetor system that had ever been on the market and that the production should be available in some 60 to 90 days....

... According to Miller, Hollingsworth identified the [A]cucarb as "the old Roy Johnson prototype that we have had up there for years." Miller testified that he "relied upon what [Hollingsworth] said to me, that was a

Roy Johnson mixer, that it had been tested for three years or more, that it had plenty of power. I say power, I am talking about horsepower...." ...

Miller further testified that in deciding to become an [A]cucarb distributor, he relied upon brochures distributed by Borg–Warner. One brochure [that was] introduced into evidence stated, "[T]his new system is designed, developed, thoroughly tested and produced by the recognized leader in LP-gas carburetion...." ... Another brochure ... [in] evidence stated that Borg–Warner developed the carburetor after "three years of intensive research and testing, both in the lab and over the road" and that the carburetor was "the result of a comprehensive developing and testing program."

In late 1979 and early 1980, Miller's regularly subscribed to *LP Gas News* and *Butane Propane News*. The December 1979 issue of *LP Gas News* and the December 1979 and January 1980 issues of *Butane Propane News* contained identical full-page [A]cucarb advertisements. The advertisements stated that the carburetor was "the result of over three years of intensive research and development—in the lab and in the field" and was "thoroughly tested." ... Miller testified that he read the [Borg–Warner] magazine advertisements and relied upon them in deciding to become an [A]cucarb distributor.

Miller's ... formally agreed to become an [A]cucarb distributor in January 1980. In late January 1980, Borg–Warner shipped [Miller's] a free sample of the [A]cucarb, which Miller's apparently found satisfactory. [Miller's] began ordering [A]cucarbs in February 1980, and received its first partial shipment on or near March 30, 1980.

*Miller's Bottled Gas*, 955 F.2d at 1045–48 (some alterations in original) (emphasis omitted).

The units were to be sold in kits comprised of accessory parts which Miller's would purchase from other manufacturers. The accessory inventory included tanks to contain liquid petroleum gas.

Also in January 1980, Miller's and Hollingsworth entered into a consulting agreement. Under the agreement, Hollingsworth agreed to act as a consultant to Miller's for the distribution of LP gas carburetion and devote such time and effort as was reasonably required by Miller's. As compensation, Hollingsworth was to receive forty percent of the annual net profits of Miller's.

On the same day in January 1980, Hollingsworth and Miller's entered into a stock option agreement. In the agreement, Miller's irrevocably granted to JPR, Inc., Hollingsworth's corporation, an option to purchase 240 shares of common stock of Miller's for a period lasting five years.

> [I]n 1980, many [A]cucarb users were experiencing difficulties. One customer testified that the problems resulted from incorrect installation of the unit. However, a former Borg–Warner employee testified that in the spring of 1980 there were "a lot of production problems." He recalled that the manufacturing line was unable to correctly assemble and machine the carburetors. He also testified that customers often installed the carburetor incorrectly by [fastening] the top plate too tightly, thus distorting it. Faulty installation, according to this witness, reduced power due to air leaks, and could cause backfiring. Borg–Warner sent its distributors supplementary parts ("update kits") to pass along to the ultimate customers, and according to one witness, the kits eliminated some [potential] for faulty installation."

Another witness testified that he talked to a lot of unsatisfied customers and that some of the dissatisfaction was well-founded due to production problems. Hollingsworth testified as follows:

> [W]e had numerous air leaks which [were] creating problems in the field. It was my feeling that a good mechanic, and I am not meaning every mechanic, but the good mechanics in the field could take a unit after they got it from Borg–Warner, overhaul it and it would work.... But the general unit that was shipped out of the factory was not working, too many air leaks involved .... air leaks create backfires, reduction in econ-

omy, hard starting .... the equipment wasn't any good.

.   .   .   .   .

On July 29, 1981, the Borg–Warner Director of Carburetion Marketing wrote Hollingsworth that numerous [A]cucarbs were failing to perform satisfactorily or failing to perform at all.

*Id.* at 1048 (some alterations in original) (emphasis omitted).

In due course, because of customer dissatisfaction, Miller's could no longer sell the kits containing the accessory parts. In order to pay the vendors from whom Miller's purchased this inventory, Miller's was forced to borrow money. Miller's borrowed a total of $294,000; the interest due on the loans eventually totaled $455,000.

> By about August 1980, Borg–Warner ... stopped manufacturing [A]cucarbs and ... introduced the "2610," which operated on the same concept as the [A]cucarb but more closely resembled the original prototypes. Several former Borg–Warner employees testified that Borg–Warner altered the [A]cucarb in several significant ways in order to produce the workable "2610."

*Id.*

Testimony described modifications and adjustments made in response to various problems, such as air leakage and inadequate fuel supply.

> According to Hollingsworth, Borg–Warner offered to exchange "2610"'s for the distributors' unsold stock of [A]cucarbs.... Hollingsworth testified that the "2610" program proved unsuccessful because "the customer[s] ... had a long memory ... [T]hey were dissatisfied with the units they had already tried and [rejected] anything that looked like or similar to an original Acucarb ...."

*Id.* (some alterations in original).

Miller's sued Borg–Warner and following a trial, an appeal, a remand, and a second trial, Miller's obtained a jury verdict against Borg–Warner for fraud and was awarded compensatory damages. The jury also awarded the plaintiff both inventory and interest damages. The district court refused

to instruct the jury on an agency theory or on a joint venture theory. However, the district court granted the defendant's motion for a directed verdict on the issue of punitive damages.

Both parties filed post-trial motions. The plaintiff filed a Fed.R.Civ.P. 59 motion for a new trial arguing that the district court erred in directing a verdict against it on the issue of punitive damages. The district court denied the motion ruling that the plaintiff made no showing that the defendant's fraud involved circumstances of aggravation or outrage warranting an instruction on punitive damages.

Borg–Warner filed a motion for judgment as a matter of law or, in the alternative, for a new trial. The district court denied the motion for judgment as a matter of law ruling that this court had determined in the first appeal that the liability issue required submission to the jury. The district court also denied the defendant's motion for a new trial ruling that the jury's award of both inventory and interest damages was not clearly erroneous and that the jury was not entitled to an instruction on agency or joint venture because Borg–Warner failed to introduce any evidence that Miller's exercised any control over Hollingsworth.

## II.

### Punitive Damages

In this diversity action, we apply the substantive law of Kentucky. *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985).

Miller's argues that the district court erred in directing a verdict for the defendant on the issue of punitive damages. Specifically, Miller's submits that once a jury has found a defendant liable for fraud, the jury must be instructed on punitive damages because if fraud has been proven then an evil motive or reckless indifference to the rights of others has necessarily been proven.

This court's standard of review of a district court's decision granting a motion for a directed verdict is identical to the standard used by the district court. *Gafford v. General Elec., Co.,* 997 F.2d 150, 170 (6th Cir.1993).

When evaluating the propriety of a directed verdict in a diversity case, we apply the standard of the state whose substantive law governs the action. *O'Neal v. Burger Chef Sys., Inc.,* 860 F.2d 1341, 1347 (6th Cir.1988). The Court of Appeals of Kentucky has summarized the standard governing directed verdicts:

> The only question to be determined by the court on a motion for directed verdict is whether the plaintiff has sustained the burden of proof by "more than a scintilla of evidence," that is, has the plaintiff submitted "evidence of probative value having fitness to induce conviction in the minds of reasonable men?" In so ruling, "The court must draw all fair and rational inferences from the evidence in favor of the party opposing the motion, and a verdict should not be directed unless the evidence is insufficient to sustain the verdict. The evidence of such party's witnesses must be accepted as true." It is well settled that circumstantial evidence "will authorize a submission of the contested issue to the jury," and is capable of sustaining its verdict.

*Grant v. Wrona,* 662 S.W.2d 227, 229 (Ky.Ct. App.1983) (citations omitted).

In 1988, the Kentucky legislature abrogated the common law in Kentucky regarding punitive damages and eased the standard a plaintiff must meet to have the issue of punitive damages submitted to a jury. Ky.Rev. Stat. Ann. § 411.184(2) (Baldwin 1991) now dictates that "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."

The cause of action in the present case clearly arose prior to the enactment of Ky. Rev.Stat. Ann. § 411.184. All of the events giving rise to the cause of action occurred in late 1979 and the early 1980s. Neither party suggests that this statute applies retroactively to the case at hand. In fact, Miller's, in its brief, concedes that the statute is inapplicable.

■ Kentucky prohibits courts from construing statutes as retroactive "unless [the statute] expressly so declare[s]." Ky.Rev. Stat. Ann. § 446.080(3). There is no such express declaration in Ky.Rev.Stat. Ann. § 411.184. We do not construe the following language in section 411.184 as the required express declaration: "This statute is applicable to all cases in which punitive damages are sought and supersedes any and all existing statutory or judicial law insofar as such law is inconsistent with the provisions of this statute." Ky.Rev.Stat. Ann. § 411.184(5).[1]

■ Because section 411.184 is inapplicable, we must examine the law as it existed in Kentucky prior to 1988 to determine whether the jury in this case should have been instructed on punitive damages. In *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382 (Ky.1985), the Kentucky Supreme Court articulated the requirements for the recovery of punitive damages. The court adopted the Restatement (Second) of Torts approach which provides: " 'Punitive damages may be *awarded for conduct that is outrageous,* because of the defendant's evil motive *or* his reckless indifference to the rights of others.' " *Id.* at 389 (quoting Restatement (Second) of Torts § 908(2) (1979)).

The court explained that a defendant's intent to injure the plaintiff is insufficient. The key, rather, is whether the defendant's "misconduct 'has the character of outrage.' " *Id.* at 389 (quoting *Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759, 762 (Ky.1974)). We take that to mean that something above and beyond the defendant's commission of an intentional tort is required. Consequently, a plaintiff is not entitled to an instruction on punitive damages merely because the plaintiff has met his burden of production on an intentional tort such as fraud.

The facts of this case do not demonstrate by "more than a scintilla of evidence" the outrageousness that is required to survive a motion for a directed verdict. Drawing all fair and rational inferences from the evidence in favor of Miller's, the proofs show only that Borg–Warner misrepresented the extent of the testing of the carburetors and their reliability. Borg–Warner appears to have done so in order to make a profit and to take advantage of what it perceived to be a suddenly opened window of economic opportunity. There is no evidence indicating that Borg–Warner acted with an evil motive. Although the jury concluded that Borg–Warner either "knew the representation[s] [were] false or made [them] recklessly without regard for [their] truth" in order to induce Miller's to rely upon them, we cannot say that Borg–Warner's conduct was "outrageous" because it acted with the "evil motive" or "reckless indifference" that the Restatement rule requires to warrant an instruction on punitive damages.

We think the district court did not err in directing a verdict for Borg–Warner on the issue of punitive damages.

### III.

### Cross-Appeal

### A.

### Inventory Damages

Borg–Warner cross-appeals the district court's refusal to grant judgment as a matter of law or a new trial on the basis that the jury's award of $125,000 in inventory damages was not supported by the evidence.

■ In reviewing a denial of a motion for judgment as a matter of law, we apply the same standard applied by the district court in denying the motion. *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 995 (6th Cir. 1994). We review the evidence in the light most favorable to the party opposing the motion and draw all reasonable inferences in favor of that party. *Id.* Judgment as a matter of law should be granted when the evidence weighs so heavily in favor of the movant that reasonable minds could not come to a different conclusion. *Id.*

■ We review a district court's denial of a motion for a new trial only for an abuse of discretion. An abuse of discretion exists

---

1. Counsel for Miller's has twice asserted that § 411.184 is not applicable to this case: first, in n. 7 of its opening brief on appeal, and, second, in a post-argument letter to the court responding to Judge Jones's question on the point during oral argument.

when the reviewing court is firmly convinced that a mistake has been made. *Wayne v. Village of Sebring,* 36 F.3d 517, 525 (6th Cir.1994).

■ In an action for fraud, the Kentucky rule for assessing damages is that the victim of the fraud is entitled to compensation for every injury which was the natural and proximate result of the fraud. *Sanders, Inc. v. Chesmotel Lodge, Inc.,* 300 S.W.2d 239, 241 (Ky.Ct.App.1957).

■ The plaintiff's purchase of accessory parts to sell with the Acucarbs was a natural and proximate result of Borg–Warner's material misrepresentations. Largely because of Borg–Warner's false representations concerning the testing and reliability of the Acucarbs, Miller's agreed to become a distributor. Miller's then had no choice but to sell the Acucarbs in kits comprised of the accessory parts. Miller's would not have purchased the kits had it not agreed to become a distributor based on the representations made by Borg–Warner. Once customers lost faith in the Acucarbs that Miller's was selling, customers wanted nothing to do with the accessory parts. We reject Borg–Warner's arguments that at various stages Miller's became aware that Borg–Warner had misrepresented the quality of the Acucarbs, thereby cutting off Miller's reliance on Borg–Warner's misrepresentations. Borg–Warner's initial misrepresentations placed Miller's in a situation in which it had little practical choice but to purchase the inventory.

The result was that Miller's was left with accessory parts worth $201,648 and pressure tanks worth $86,045. These costs were a natural, probable, and foreseeable result of Borg–Warner's material misrepresentations. We think there was abundant evidence to support the jury's verdict of $125,000 in inventory damages. The district court did not err in refusing to grant judgment as a matter of law or abuse its discretion in refusing to grant a new trial on the inventory damages issue.

## B.

### Interest Damages

Borg–Warner also challenges the jury's award of $250,000 in so-called interest damages. Borg–Warner claims that damages for interest payments cannot be recovered in a fraud case. The defendant also argues that Miller's did not prove a causal connection between Borg–Warner's misrepresentations and Miller's interest expenses because neither Miller's nor Borg–Warner anticipated that Miller's would be required to borrow money to pay the vendors from whom Miller's purchased the accessories that would comprise the kits.

To justify the jury's award of interest damages, it must appear that loans taken out and the resulting interest were a natural and proximate result of Borg–Warner's fraudulent conduct. *Sanders,* 300 S.W.2d at 241.

■ In the context of securities fraud, courts have required that a plaintiff prove "loss causation" in order to recoup interest damages. Specifically, a plaintiff must prove that the defendant's misrepresentations played a direct part in the debt that the plaintiff incurred. *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 688 (11th Cir.1983); *Polycast Technology Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244, 277 (S.D.N.Y.1992).

■ Borg–Warner knew that distributors such as Miller's would have to assemble kits to sell with the Acucarb comprising of parts purchased from other manufacturers. But for Borg–Warner's misrepresentations, Miller's would have had no reason to assemble kits. And because of Borg–Warner's false representations as to the quality and reliability of the Acucarbs, it could foresee that Miller's' market would vanish and that Miller's would be unable to sell its inventory of kits and would have to borrow money to pay the manufacturers from whom the component parts were purchased. It was especially foreseeable because Miller's is a relatively small corporation which could not pay large debts while simultaneously suffering the loss of a customer base.

■ Borg–Warner also challenges the amount of interest damages the jury awarded. Borg–Warner claims that Miller's is not entitled to the interest on $163,955 which Miller's acquired through the sale of 441 of the tanks. Borg–Warner also claims that the amount Miller's sought was inflated because it was based on a constant principal of $295,-000 when Miller's has been making monthly payments since 1981.

We reject these arguments as without merit. The jury awarded Miller's only $225,-000 in interest damages. The jury may well have taken into account the fact that Miller's sold some of the tanks and may have simply inaccurately calculated the damages while awarding Miller's substantially less than it sought. We, therefore, decline to reverse the district court's order denying the defendant's motion for judgment as a matter of law or a new trial.

## C.

### Jury Instructions

Borg–Warner argues that Hollingsworth was working on behalf of both Miller's and Borg–Warner and was, therefore, an agent of Miller's. Borg–Warner also argues that Hollingsworth and Miller's were engaged in a joint venture. Under both theories, Hollingsworth's knowledge would be imputed to Miller's thereby precluding Miller's from recovering on its fraud claim. Borg–Warner claims the district court erred in refusing to instruct the jury on its theories of agency and/or joint venture.

■ A trial court may refuse to instruct the jury on an issue when there has been insufficient evidence presented to support a jury finding on that issue. *Jones v. Consolidated Rail Corp.*, 800 F.2d 590, 592 (6th Cir.1986).

■ Kentucky law has established that the existence of a right to control is the key element in determining whether an agency relationship exists. *Grant v. Bill Walker Pontiac–GMC, Inc.*, 523 F.2d 1301, 1305 (6th Cir.1975); *Shedd Brown Mfg. Co. v. Tichenor*, 257 S.W.2d 894, 895 (Ky.Ct.App.1953).

■ The evidence shows that Future Fuels (an alter ego of Miller's) and Hollingsworth entered into a consulting agreement on January 1, 1980. Under the agreement, Hollingsworth agreed to act as a consultant to Future Fuels for the distribution of LP gas carburetion and agreed to devote such time and effort as was reasonably required. As compensation, Hollingsworth was to receive forty percent of the annual net profits of Future Fuels. On the same day, the two entered into a stock option agreement. In the agreement, Future Fuels irrevocably granted to JPR, Inc., Hollingsworth's corporation, an option to purchase 240 shares of common stock of Future Fuels for a period lasting five years.

Borg–Warner relies upon these two agreements in support of its argument that Hollingsworth was an agent of Miller's. These agreements do not establish that Miller's exercised any control over Hollingsworth. Hollingsworth was merely a consultant to Miller's and acted as such when he advised Miller's to assemble kits for use with Borg–Warner's carburetors. Miller's had no control over Hollingsworth's actions or representations. In fact, Miller's likely hired Hollingsworth as a consultant for the independent advice that he would render. Moreover, the consulting agreement itself expresses the intent of the parties that Hollingsworth was to be considered independent from Miller's. The agreement reads:

8. *STATUS:* It is recognized by the parties hereto that JPR, INC., is and all times an independent contractor and neither it nor any of its employees performing the services contemplated hereunder shall be considered employees of FUTURE FUELS, INC.

The district court, therefore, did not err in refusing to give a jury instruction on an agency theory because there was insufficient evidence to support such an instruction.

■ To establish a joint venture in Kentucky, the following elements must be present: (1) an agreement, express, or implied; (2) a common purpose to be carried out; (3) a community of pecuniary interest in that purpose; and (4) an equal right to a voice in the direction of the enterprise which gives an

equal right of control. *Huff v. Rosenberg*, 496 S.W.2d 352, 355 (Ky.Ct.App.1973) (citing Restatement (Second) of Torts § 491 cmt. c. (1977)). The essential element of a joint venture is the element of joint control. *Y.W.C.A. of Owensboro v. Family Y of Owensboro–Daviess County, Inc.*, 488 S.W.2d 358, 361 (Ky.Ct.App.1972).

■ For the same reasons that the evidence did not support an agency instruction, it does not support a joint venture instruction. Certainly, Hollingsworth had a voice in the direction of Miller's. However, that voice was merely one of suggestion and not the voice of authority to control Miller's decision making. Miller's final purchasing decisions rested solely with Miller's and with no one else.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's order denying plaintiff's motion for a new trial, and we **AFFIRM** the district court's order denying defendant's motion for judgment as a matter of law or a new trial.