NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name:  14a0199n.06

Case No. 13-6150

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Mar 14, 2014*
DEBORAH S. HUNT, Clerk

SHEILA RUNKLE, Administratrix of Estate of
Robert Earl Runkle,

 Plaintiff-Appellant,

v.

RONALD FLEMING,

 Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

**O P I N I O N**

BEFORE:  GILMAN, COOK, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  This case concerns the medical treatment that Plaintiff Sheila Runkle's deceased husband, Robert Runkle, received while he was in prison.  While incarcerated, Robert Runkle had two episodes of small bowel cancer, and for a period of time between those two episodes, he was under the care of the defendant, Dr. Ronald Fleming. Runkle argues that Dr. Fleming failed to timely place an order for his annual colonoscopy with the third-party approving authority, and that as a result of Dr. Fleming's alleged failure to do so, Runkle suffered a lower quality of life during his final days.  Runkle alleged violations of the statutory right to medical care, the tort of outrage, and medical negligence.  The district court granted summary judgment to Dr. Fleming on all three claims.  For the reasons that follow, we affirm the judgment of the district court with respect to the statutory right-to-medical-care and

the tort-of-outrage claims, but reverse the district court's judgment with respect to the medical negligence claim.

I.

Runkle's history of cancer traces back to July 2003, when he was diagnosed with small bowel cancer while incarcerated at the Western Kentucky Correctional Complex. He was transferred to another facility for surgery, which involved extensive surgical resectioning of his intestine, and later transferred to another facility for follow-up care that included chemotherapy. Because Runkle's cancer had invaded his lymphatic system, where it continued to spread, his prognosis was poor. However, all of the diagnostic tests performed on Runkle from 2003 to 2005 tested negative for recurrent disease. In August 2004, Runkle was transferred back to the Western Kentucky Correctional Complex on the condition that he receive yearly colonoscopies. On June 7, 2005, he received his annual colonoscopy.

On March 27, 2006, Runkle was transferred to the Little Sandy Correctional Complex. Sometime in May 2006, Runkle came under the care of the defendant, Dr. Ronald Fleming, a University of Kentucky employee who worked at the complex as a prison doctor. Specifically, Dr. Fleming was an independent contractor with Prison Health Services, an entity which had contracted with the Kentucky Department of Corrections to provide health services to the inmates.

On May 10, 2006, Runkle had a patient visit with Dr. Fleming, during which Runkle complained of high blood pressure and acid reflux. During the appointment, Runkle told Dr. Fleming that he had a history of cancer, and he requested his annual colonoscopy. From his review of the record, Dr. Fleming knew that Runkle had a history of small bowel cancer that was

treated with surgical resection and chemotherapy.[1]  Dr. Fleming offered Runkle a rectal examination and a Hemoccult card,[2] but Runkle refused both and instead requested a colonoscopy.

Because the Little Sandy Correctional Complex lacked the means to perform a colonoscopy, doctors who requested that such procedures be done had to submit a request for approval to CorrectCare, a third party who either approved or denied the procedures ordered by the doctors.  This process involved the doctor putting in an order for treatment, or seemingly the nurse doing so at the direction of the doctor.  CorrectCare's approval or denial would then be communicated to the Little Sandy Correctional Complex.  According to Dr. Fleming, on May 10, following the appointment with Runkle, he put in an order for Runkle to receive additional laboratory work and a colonoscopy.

According to Dr. Fleming, the May 10 colonoscopy order was denied.  Dr. Fleming stated that he learned of the denial from Nurse Jennifer Gilliam, who, according to Dr. Fleming, orally communicated the denial to Dr. Fleming.  Dr. Fleming stated that Nurse Gilliam did not specify the reason that the procedure was denied, and that he was not aware of a written record of the denial.[3]  According to Dr. Fleming, when he saw Runkle later that summer in the facility's yard, he told Runkle "several times" that the colonoscopy he ordered on May 10 was denied.  He also told Runkle that he would need to exhibit more symptoms in order to have the colonoscopy

---

[1] Dr. Fleming at times either described Runkle's small bowel cancer as colon cancer, or he failed to correct Runkle when Runkle described his small bowel cancer as colon cancer.

[2] A Hemoccult card is a method used to detect the presence of fecal blood.

[3] Dr. Fleming's testimony is arguably contradicted by two nurses, who indicated that there would never be an instance in which a nurse orally communicated an approval or denial absent a written record from the reviewing authority.  Because no written record of Dr. Fleming's May 10 request exists, Runkle argues that Dr. Fleming is not being truthful when he asserts that he ordered the first colonoscopy.

approved; namely, Runkle would need to return Hemoccult cards, and these cards would then need to test positive for blood.

On or around July 26, 2006, Dr. Fleming saw Runkle for a second appointment, this time because Runkle complained of vertigo. During the appointment, Runkle again asked about his annual colonoscopy. Dr. Fleming again told Runkle that the May 10 colonoscopy order had been denied, and that Runkle would need to either return Hemoccult cards that tested positive for blood, or complain of belly pain or rectal bleeding in order to be approved for a colonoscopy. Runkle did not see Dr. Fleming again.

In early September 2006, Runkle reported to the Little Sandy Correctional Complex's sick call with his Hemoccult cards, complaining of abdominal pain and blood in his stool. Runkle's Hemoccult cards tested positive for blood. On September 15, 2006, Dr. Fleming placed an order for Runkle's colonoscopy. On September 20, 2006, CorrectCare approved the order for a colonoscopy.[4]

On October 10, 2006, Runkle's colonoscopy was performed at a separate facility. During the procedure, the attending doctor, Ewell Scott, discovered a suspicious mass in Runkle's bowel. Dr. Scott noted that he believed that he had discovered a tumor. Dr. Scott noted that if the biopsies he had taken did not show malignancy, that he would have the procedure repeated as soon as possible. Following the colonoscopy, on October 14, 2006, Runkle wrote a letter to the Department of Corrections. Runkle requested that he be released before serving out the entirety of his prison sentence so that he could spend his final days at home with his family. In his letter, Runkle stated, "[a] few days ago I was taken out to the hospital for an endioscope and a

---

[4] For this order, there is evidence of a written record.

colonoscopy and the [doctor] told me that my cancer is back again, very bad news." R. 31-14, Runkle Letter at 1–3, PageID # 209–11.

On October 16, 2006, in response to Dr. Scott's findings, Dr. Fleming issued to the Kentucky Department of Corrections a special order stating that Runkle needed to be urgently transferred because of the mass found during his colonoscopy. The pathology report concerning the mass, however, eventually came back as benign. At some point, the fact that it was reportedly benign was communicated to Runkle, which indicates that at some point after writing his letter, Runkle no longer believed that his cancer had returned.

On December 27, 2006, however, Runkle underwent a computed tomography ("CT") scan that revealed two masses, one in his small intestine and another in his rectum, both indicative of cancer. On February 26, 2007, during exploratory surgery, it was definitively confirmed that Runkle's cancer had indeed returned. The attending surgeon testified that the cancer had infiltrated Runkle's abdomen and had metastasized into his pelvic region. Due to the terminal nature of the cancer, the surgeons chose not to resect the rectal mass or the small bowel cancer.

In November 2007, Runkle was released on medical parole and began chemotherapy. He discontinued his chemotherapy treatments in March 2008. On June 28, 2008, Runkle passed away.

Runkle's wife and the Administrarix of his estate, Sheila Runkle, originally filed this civil action against Dr. Fleming on December 28, 2007. Following the non-prejudicial dismissal of state law claims, Runkle refiled this action in November 2011, alleging violations of the statutory right to medical care, the tort of outrage, and medical negligence. The district court granted summary judgment to Dr. Fleming on all three claims. As to the statutory right to

medical care, the district court found that there was no private right of action available to Runkle. As to the tort of outrage, the district court found that Runkle failed to produce any evidence that Dr. Fleming acted intentionally or recklessly, or that Runkle's emotional distress was caused by Dr. Fleming. As to the medical-negligence claim, the district court found that Runkle's claim was barred by the statute of limitations on the basis that Runkle was aware that he had recurrent cancer on or before October 14, 2006, meaning that Runkle filed outside of the one-year window permitted by the statute. This appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*. *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010). We examine a motion for summary judgment by viewing the facts in the light most favorable to the nonmoving party. *See id.* Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007) (quoting *Allstate Ins. Co. v. Thrifty Rent–A–Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)). Accordingly, we apply Kentucky law. *See id.* We will consider in turn the district court's grant of summary judgment to Dr. Fleming on Runkle's claims concerning the statutory right to medical care, the tort of outrage, and medical negligence.

A.

Runkle first appeals the district court's grant of summary judgment to Dr. Fleming on her statutory right-to-medical-care claim. Kentucky law provides that the State Department of Corrections must "[p]romulgate administrative regulations for . . . the preservation of the health of prisoners." Ky. Rev. Stat. § 197.020(1)(b). The corresponding administrative regulations consist of policies providing that "inmate[s] shall be provided access to health care services," with an emphasis on preventive care. 501 Ky. Admin. Regs. 6:020, Policy 13.2. The regulations also set forth requirements for prisoner medical care upon admission and throughout the prisoner's stay, including addressing routine health needs, providing physical examinations, and developing an institutional emergency medical-services plan. *Id.* Runkle argues that Dr. Fleming violated § 197.020 as well as the corresponding regulations during Runkle's course of treatment.

Notably, the regulations do not provide any private right of action for prisoners to sue the corrections facility, its employees, or its agents. Rather, the regulations provide in pertinent part as follows:

> If an individual believes that he has suffered a loss or injury to his person or property as a result of negligence on the part of Corrections or its *employee or agent*, he may file a claim with the Board of Claims. *All claims shall be processed through the Board of Claims if payment is required.*

501 Ky. Admin. Regs. 6:020, Policy 14.5 (emphasis added). Therefore, the regulation at issue expressly designates the Board of Claims as the appropriate forum for grievances relating to § 197.020.

In Kentucky, "[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Because the administrative

regulation at issue here sets forth the unlawful act and specifies the civil remedy available—

filing a claim with the Board of Claims—a private right of action in federal court is not available

to Runkle. Therefore, Runkle's statutory right-to-medical-care claim must fail.

In an attempt to argue otherwise, Runkle stresses the fact that Dr. Fleming was an

independent contractor, not an employee. Indeed, Dr. Fleming was an independent contractor

with Prison Health Services, who in turn had contracted to provide medical services to the

Department of Corrections. But Runkle fails to acknowledge the part of the regulation

specifying that the Board of Claims is the appropriate venue for negligence claims "on the part of

Corrections or its employee *or agent*[.]" 501 Ky. Admin. Regs. 6:020, Policy 14.5 (emphasis

added).

"Kentucky law has established that the existence of a right to control is the key element

in determining whether an agency relationship exists." *Miller's Bottled Gas, Inc. v. Borg-

Warner Corp.*, 56 F.3d 726, 736 (6th Cir. 1995). The agency relationship between Dr. Fleming

and the Department of Corrections is clear, as all of Dr. Fleming's patients were prison inmates,

all of his supplies were provided by the Department of Corrections, and Dr. Fleming's patient

care took place at the Department of Corrections' facility. The clear-cut nature of the agency

relationship here is underscored by the fact that Runkle does not make a single argument casting

doubt on the fact that Dr. Fleming's work activities were controlled by the Department of

Corrections. We therefore affirm the district court's grant of summary judgment to Dr. Fleming

on Runkle's statutory right-to-medical-care claim.

B.

Runkle next appeals the district court's grant of summary judgment to Dr. Fleming on her

outrageous-conduct claim. Showing a violation of the tort of outrageous conduct involves the

same elements as those in a claim for intentional infliction of emotional distress. *See* Restatement (Second) of Torts § 46 (1965). "In order to establish such a claim, [Runkle] must prove the following elements: [Dr. Fleming's] conduct must be intentional or reckless; the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; there must be a *causal connection* between [Dr. Fleming's] conduct and the emotional distress and the distress suffered must be severe." *Osborne v. Payne*, 31 S.W.3d 911, 913–14 (Ky. 2000) (emphasis added); *see also Ford v. Gen. Motors Corp.*, 305 F.3d 545, 555 (6th Cir. 2002) (outlining the same elements for an intentional-infliction-of-emotional-distress claim).

As to what constitutes actionable outrageous conduct, the Kentucky Supreme Court has adopted the definition provided in the Second Restatement of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious . . . or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," . . . *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community*.

*Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)) (emphasis in *Humana*). It is the court's duty "to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788–89 (Ky. 2004). One example of a case in which a Kentucky court found outrageousness lacking involved a nurse shouting "shut up" to an upset female patient who had just delivered a stillborn baby. *See Seitz*, 796 S.W.2d at 2–4. Moreover, "[w]here an actor's conduct amounts to the commission of one of the traditional torts such as . . . negligence for which recovery for emotional distress is allowed, *and the conduct was not intended only to cause extreme emotional*

*distress in the victim*, the tort of outrage will not lie." *Bennett v. Malcomb*, 320 S.W.3d 136, 137 (Ky. Ct. App. 2010) (emphasis added).

Runkle alleges that Dr. Fleming failed to order the May 10 colonoscopy, and that this failure was evident based on the nurses' testimony and on the lack of a paper record of the order. Runkle argues that Dr. Fleming's conduct is sufficiently outrageous to withstand a motion for summary judgment because Dr. Fleming was allegedly dishonest in telling Runkle that the order was denied. But even accepting as true Runkle's allegation that Dr. Fleming did not order the colonoscopy and that he lied about it, Runkle produces no evidence suggesting that Dr. Fleming acted with the intent to cause Runkle extreme emotional distress. He also points to no evidence supporting a causal link between Dr. Fleming's alleged behavior and Runkle's distress. *See Osborne*, 31 S.W.3d at 913–14. While Runkle undoubtedly suffered emotional distress upon learning that his cancer had returned, Runkle demonstrates no link between the distress that he felt and Dr. Fleming's supposed lie concerning the May 10 colonoscopy order. Put differently, there is nothing in the record suggesting that Dr. Fleming's conduct compounded Runkle's understandable feelings of distress at having cancer. Runkle's tort-of-outrage claim thus fails as a matter of law. We therefore affirm the district court's grant of summary judgment to Dr. Fleming on Runkle's tort-of-outrage claim.

C.

Finally, Runkle appeals the district court's grant of summary judgment to Dr. Fleming on the medical-negligence claim. The district court found that Runkle's medical-negligence claim was barred by the statute of limitations. In cases where summary judgment is granted on statute-of-limitations grounds, "we must determine whether (1) the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action

accrued." *Campbell v. Grand Trunk W. R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). As the statute of limitations is an affirmative defense, the burden is on Dr. Fleming to show that the statute of limitations has run on Runkle's medical-negligence claim. *See id.*

In Kentucky, an "action against a physician, surgeon, dentist, or hospital . . . for negligence or malpractice" must be commenced within one year after the cause of action accrued. Ky. Rev. Stat. Ann. § 413.140(1)(e). The means by which courts identify the accrual of a cause of action, particularly in light of an injury that is not readily discoverable, is outlined in what Kentucky courts term the "discovery rule," which states as follows: "the cause of action shall be deemed to accrue at the time the injury is first discovered or in the exercise of reasonable care should have been discovered[.]" *Id.* at § 413.140(2).

The seminal case interpreting the discovery rule is *Wiseman v. Alliant Hospitals, Inc.*, 37 S.W.3d 709 (Ky. 2000). In *Wiseman*, the Kentucky Supreme Court held that, in a medical malpractice or negligence claim, "the statute of limitations does not begin to run even though a harmful condition is known to a plaintiff so long as its negligent cause and its deleterious effect are not discovered." *Id.* at 712. The court explained the difference between "harm" and "injury," noting that in the context of medical negligence, *harm* concerned the loss of health following medical treatment, or the lack thereof, while *injury* involved the "actual wrongdoing, or the malpractice itself." *Id.* "Under the discovery rule, it is the date of the actual or constructive knowledge of the *injury* which triggers the running of the statute of limitations" as opposed to actual or constructive knowledge of the *harm*. *Id.* (emphasis added). The rule is structured this way so that a plaintiff knows that he "has a basis for a claim before the statute of limitations begins to run." *Id.* Importantly, the "knowledge necessary to trigger the statute is

two-pronged; one must know: (1) he has been wronged; and, (2) by whom the wrong has been committed." *Id.*

The facts and determination of Wiseman's case are instructive in understanding how the rule works in practice. In *Wiseman*, plaintiff Wiseman sued a doctor for negligence due to a botched procedure that resulted in the tip of a uterine probe, a metal surgical instrument, being left in her body. *Id.* at 711. The procedure occurred in August 1989, and Wiseman had begun experiencing pain in the affected area as early as the following month. *Id.* She continued to experience pain over the next four to five years. *Id.* The tip of the probe was discovered during a January 1996 operation, and Wiseman filed suit eleven months later. *Id.* Although Wiseman could trace her experienced pain to the date of her 1989 procedure, and despite the fact that she had suspected that some complication resulting from the 1989 procedure was the origin of her pain, the court found that this suspicion "in and of itself was insufficient to accrue a cause of action." *Id.* at 712. The Kentucky Supreme Court reasoned that despite her being aware of the harm done to her, she had not yet discovered that "she had been the victim of medical malpractice" and that her "action did not accrue until her *injury* became objectively ascertainable." *Id.* at 713 (emphasis added). The court held that a "legally recognizable injury does not exist until the plaintiff discovers the defendant's wrongful conduct" and, because Wiseman's "injury was not readily apparent until the discovery of the piece of uterine probe, she was unaware that she had a viable claim for medical malpractice." *Id. Wiseman* thus stands for the proposition that for medical negligence claims, in "order to trigger the statute of limitations, a plaintiff must discover the injury—the invasion of a legally protected interest." *Id.*

Applying that standard to the facts of this case, we think it clear that Runkle's belief, as stated in his October 14, 2006 letter to the Department of Corrections, that his cancer had

recurred—irrespective of the issue that he was later told that the tumor was benign—did not trigger the statute of limitations for his medical negligence claim. Dr. Fleming concedes that the "May 10, 2006 colonoscopy order is the heart of [Runkle's] medical negligence claim against Dr. Fleming." Def. Br. at 12. While Dr. Fleming contends that he did order the colonoscopy at that time, Runkle points to the lack of a written record of CorrectCare's denial as well as the nurses' testimony on the usual order procedure. And even if the order was actually placed, Runkle's claim turns on whether, "except for Dr. Fleming's failure to meet the standard of care, Mr. Runkle could have had his pain controlled, progression of his small bowel cancer delayed and, in turn, his symptoms lessened, affording him a better quality of life." Pl. Rep. Br. at 8. Runkle's pre-diagnosis letter stating that his cancer had returned does not demonstrate that he knew of any actual wrongdoing on Dr. Fleming's part at that time. *See Wiseman*, 37 S.W.3d at 712 ("[T]o trigger the statute . . . one must know: (1) he has been wronged; and, (2) by whom the wrong has been committed."). Therefore Runkle's statement on October 14 concerning the return of his cancer does not satisfy the knowledge requirement described in *Wiseman*, meaning that it did not trigger the statute of limitations.[5] *See id.*

Our conclusion that Runkle's October 14 letter did not start the statute of limitations for his medical-negligence claim is not only consistent with Kentucky Supreme Court's standard as outlined in *Wiseman*, but also well supported by other Kentucky precedent. *See Vannoy v. Milum*, 171 S.W.3d 745, 749 (Ky. Ct. App. 2005) (noting that "a cause of action will not accrue under the discovery rule until the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct") (internal quotation marks omitted)); *see also Imes v. Touma*,

---

[5] Dr. Fleming argues that Runkle is estopped from contesting Dr. Fleming's statute-of-limitations defense, but his argument confuses harm with injury.

784 F.2d 756, 758 (6th Cir. 1986) ("When the injury would not necessarily indicate the presence of negligence, the cause of action accrues when the plaintiff knows or should have known of the possible negligence."); *Louisville Trust Co. v. Johns-Manville Products Corp.*, 580 S.W.2d 497, 500 (Ky. 1979) (observing that "when an injury does not manifest itself immediately the cause of action should accrue not when the injury was initially inflicted, but when the plaintiff knew or should have known that he had been injured by the conduct of the tortfeasor"). Because the CT diagnosis occurred after December 27, 2006, the December 28, 2007 complaint satisfied the one-year statute of limitations. We therefore reverse the district court's grant of summary judgment to Dr. Fleming on Runkle's medical-negligence claim.

III.

The district court's grants of summary judgment to Dr. Fleming with respect to the statutory right-to-medical-care claim and the tort-of-outrage claim are **AFFIRMED**. Because we find that the statute of limitations did not begin to run upon Runkle's learning that his cancer had returned, the district court's grant of summary judgment to Dr. Fleming with respect to the medical-negligence claim is **REVERSED** and **REMANDED** to the district court for proceedings consistent with this opinion.