D. Michelle BERGMAN, Plaintiff

v.

BAPTIST HEALTHCARE SYSTEM, INC., Defendant.

Civil Action No. 3:03CV–291–H.

United States District Court, W.D. Kentucky, at Louisville.

July 28, 2004.

Elizabeth Fust, Leightty & Associates, Louisville, KY, for Plaintiff.

Elizabeth Nugent Monohan, Raymond C. Haley, III, Woodward, Hobson & Fulton, LLP, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff Michelle Bergman filed a claim in state court against Baptist Healthcare System, Inc. d/b/a Western Baptist Hospital ("WBH") for pregnancy discrimination under Title VII and the Kentucky Civil Rights Act. WBH later removed to federal court and has moved for summary judgment. After reviewing the facts and law, the Court concludes that Bergman cannot make a proper claim under any cause of action. The Court will therefore dismiss all of Plaintiff's claims.

### I.

On February 4, 2002, Plaintiff Bergman began working at WBH as a full-time infant teacher. Her duties included caring for, feeding, changing and lifting infants four to six months old. During a two-day orientation for new employees she received a copy of Baptist Healthcare's Employee Handbook, which explained the at-will employment relationship and described various leave policies.[1] At the time the book was published in spring 2000, WBH extended the leave rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., to employees who had worked only three months for WBH and who needed a leave for their own serious health condition. Those employees were entitled to all leave and rights available under the FMLA, even though they had not worked the FMLA's required 12 months. See 29 U.S.C. § 2611(2)(A). In September 2001, WBH changed that policy, reinstating the FMLA's requirement that eligible employees must have worked 12 months for WBH before being entitled to FMLA leave.

At the same time, WBH created a new policy entitled the "Personal Illness Leave Policy." Under this new policy, an employee who had worked three months at WBH would be eligible for a leave of absence for her own serious health condition. The employee would only be guaranteed a right to return to her position so long as she had not exhausted her paid time off ("PTO") and accrued sick time while on leave. Once the employee on leave under this policy had used all of her PTO and accrued sick time, she would not be guaranteed a position to which to return. The maximum leave an employee could take under the policy was three months. In September 2001, WBH informed existing employees of the change by memoranda via the company intranet. WBH later distributed the new employee handbook incorporating the changes to new hires sometime in spring 2002 after Bergman attended orientation.[2]

In early April 2002, Bergman learned that she was pregnant and soon began experiencing complications. On April 18, 2002, Bergman notified WBH that she would be unable to work until May 6,

---

1. Bergman signed a receipt acknowledging she had received the handbook.

2. WBH claims that, before the revised handbook was distributed in spring 2002, the company's Benefits Coordinator, Blanche Hensley, verbally explained the new leave policy change to new hires, including Bergman, during the February 2002 orientation. Plaintiff does not recall this part of the presentation by Hensley. Regardless of which version of the facts is true, Plaintiff's knowledge of the new policy change is not a material fact in the outcome of this case. Even assuming Bergman had *not* been informed of the new leave policy, she was still unable to perform her job as an infant teacher or "breaker" under her physical restrictions ordered post-surgery. Moreover, she still had not accumulated enough PTO and sick leave to take a week off after surgery and be assured she could return to the same job.

2002. Her supervisor, Pat Hayes, mistakenly allowed a two-week leave of absence even though Bergman had only worked at WBH a little over two months. Bergman returned to work, but with physical restrictions. Her doctor sent notes dated May 1 and May 22 stating that Bergman could not lift more than 20 pounds for the duration of her pregnancy. WBH's policy allowed an employee to work with restrictions for no more than thirty days. Bergman's due date was not until December 15, 2002, several months after the doctor ordered the restrictions. Nevertheless, WBH decided to accommodate the lifting restrictions. Hayes, her supervisor, determined that her duties need not be altered because only one infant in her room weighed around 20 pounds, and Bergman's assistant teacher agreed to lift the heaviest infant. Bergman could lift the other infants who were smaller. Furthermore, Hayes told Bergman that she could change an infant on a mat on the floor if necessary.

In early August, Bergman suffered from additional pregnancy complications and experienced extreme pain. Her doctor determined she was in early labor and scheduled emergency surgery to help her carry her pregnancy to term. Without the surgery, Bergman believed that she would lose her baby. On August 6, Bergman informed WBH that she was having surgery in two days and would need a week to recover. Upon returning to work, she would then be physically limited to working only half days and "light duty only." When Pat Hayes inquired what light duty meant, Bergman told her she would be unable to lift at all. Bergman alleges that Hayes promised her she could stay at WBH as a "breaker," which is someone who substitutes for other teachers while they are on breaks.

On August 7, Bergman worked a half-day. That same day, Hayes spoke with Dick Thomas, WBH's Executive Director of Human Resources, as well as Ann Croft, Employee Health Nurse, regarding Bergman's new restrictions. They determined that no positions at the Child Care Center were available for Bergman with her new restrictions and that she would no longer be able to work for WBH. Even the breaker position required the employee to lift children when necessary. Hayes called Bergman at home the night of August 7 to tell her that they needed to talk prior to the surgery. The next day Hayes met with Bergman and terminated her. Bergman claims that Hayes stated Thomas did not want her to work and he was concerned Bergman would be "a risk."

At the time of her termination, Bergman had 16 PTO hours and just under 17 hours of accrued sick time. Bergman was eligible for re-employment as a caregiver or infant assistant, but she never re-applied for those positions after childbirth. She has not applied for any other jobs in the childcare industry.

## II.

Bergman alleges that she was terminated because of her pregnancy. Title VII and the Kentucky Civil Rights Act prohibit an employer from discriminating against an employee "because of sex," which includes discrimination on the basis of pregnancy. 42 U.S.C. §§ 2000e(k), 2000e–2(a); KRS 344.030(8), 344.040. One proves such a case by offering either direct or circumstantial evidence. *See Prebilich–Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir.2002). Bergman presents no direct evidence of discrimination. Richard Thomas's isolated and ambiguous statement about "risk" is far from such evidence. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571–72 (6th Cir. 2003) (en banc). Consequently, the Court must analyze her claims under the eviden-

tiary framework for circumstantial evidence set forth in *McDonnell Douglas Corp. v. Green* which requires that the plaintiff first establish a *prima facie* case of discrimination. 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Prebilich–Holland*, 297 F.3d at 442. If Bergman successfully establishes a *prima facie* case, then the burden of production shifts to WBH to articulate a legitimate, nondiscriminatory reason for terminating her. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir.2000). If WBH satisfies this burden, Bergman must then prove by a preponderance of the evidence that WBH's nondiscriminatory reason was not credible, but rather a pretext for intentional discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *Cline*, 206 F.3d at 658.

### A.

■ To establish a *prima facie* case of pregnancy discrimination, Bergman must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Prebilich–Holland*, 297 F.3d at 442 (quoting *Cline*, 206 F.3d at 658) (internal quotation marks omitted). Bergman's *prima facie* case of pregnancy discrimination fails because she cannot establish either that she was qualified for her job as an infant teacher or a nexus between her pregnancy and the termination of her employment.

First, Bergman cannot show her qualification for the job because she cannot perform either the full-time infant teacher job or the "breaker" job. After her surgery, she was physically limited to working only half-days and no lifting for the four months remaining in her pregnancy. These restrictions would have precluded

anyone, not just a pregnant employee, from working as a full-time infant teacher.

Second, the evidence does not suggest a nexus between her pregnancy and the termination of her employment. Initially, WBH accommodated Bergman's restrictions ordered by her doctor at the outset of her pregnancy. Although Bergman was later found ineligible for leave in April, WBH still gave her several days off work in April and May to take care of pregnancy complications before asking her to return to work. And, even though WBH's policy generally allowed only 30 days of restrictions, WBH permitted her to work with a twenty-pound lifting restriction for the several months remaining in her pregnancy. Not until Bergman stated that she would return from surgery in August with no-lifting and half-day restrictions, which made her incapable of doing her job, did WBH take more drastic action.

Bergman could show a nexus between her pregnancy and her termination by offering evidence that she was treated differently than a similarly situated employee outside the protected class, here defined by pregnancy. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir.1992). Bergman, however, has offered no such proof. She presented no evidence that a non-pregnant employee with similar physical restrictions was allowed to remain as an infant teacher or to work as a "breaker," as Hayes allegedly promised Bergman. Furthermore, she presented no evidence that a non-pregnant employee with similar amounts of accrued leave time was permitted to take a leave of absence in excess of the accrued leave time and return to his or her same job. Under the company's Personal Illness Leave Policy, Bergman would have been permitted to take *some* time off for her surgery in August. By that point, she had been at WBH for about six months, and according

to the leave calculations on her final pay-stub, she had approximately 33 hours of PTO and accrued sick leave. A week's absence would have depleted all Bergman's paid time. She would no longer be guaranteed her position upon return. Bergman would have had to reapply for another job; regardless, she could not remain as an infant teacher because she could not perform its duties. WBH was willing to consider her for a caregiver or infant assistant position, but Bergman never reapplied.

This sequence of events suggests that her termination was based on the fact that she physically could not perform her job duties, not her pregnancy status. None of this evidence tends to show discrimination. Bergman has therefore not established a *prima facie* case of pregnancy discrimination.

### B.

■ Even if Bergman set forth a *prima facie* case, WBH has offered a legitimate, nondiscriminatory reason for termination: Bergman could not perform the required duties of an infant teacher. Bergman was hired as a full-time infant teacher. In this position, she was required to lift infants and children at unexpected times throughout the day. WBH could not place her in a room with children and guarantee that she would not have to pick a child up or lift an object, such as a fallen toy or chair. Since WBH has offered a legitimate, nondiscriminatory reason for Bergman's termination, she must now offer evidence from which a jury could conclude that this stated reason was a mere pretext.

Bergman can demonstrate pretext by "showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir.2003)

(quoting *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir.2002)) (internal quotation marks omitted). Because Bergman admitted she was physically restricted from performing her job duties, she cannot prove the proffered reason had no basis in fact or was insufficient to warrant WBH's belief that she could not perform the required work. No evidence suggests that Bergman could perform the work required of a full-time infant teacher or even a "breaker." Bergman has introduced no evidence that the real reason for her termination may have been her pregnancy as compared to her inability to perform her job. Therefore, Bergman has no evidence suggesting that WBH's stated reasons were a mere pretext.

The Supreme Court recently stated in *Reeves v. Sanderson Plumbing Products, Inc.* that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some ... nondiscriminatory reason for the employer's decision...." 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The record in this case likewise reveals a nondiscriminatory reason for terminating Bergman. Bergman therefore has not met her burden, and the Court must dismiss her discrimination claim.

### III.

■ Bergman also alleges a claim for breach of express or implied contract. Bergman, however, cannot recover for breach of an employment contract because she was an at-will employee of WBH. Bergman had no written or verbal employment contract with WBH and could have been terminated at any time for any reason. *Firestone Textile Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky.1983). And, in fact, Bergman confirmed her at-will status when she signed a receipt acknowledging that she had received the employee hand-

book. Under Kentucky law, parties can alter the normal at-will employment relationship only with a clear, *express* statement of their intent to do so. *See Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 492 (Ky.1983); *see also Hines v. Elf Atochem N. Am., Inc.*, 813 F.Supp. 550, 552–53 (W.D.Ky.1993). The only statement allegedly made by WBH that could possibly be construed as some kind of "contractual promise" was Hayes's statement that Bergman could work as a "breaker." Hayes's statement, however, cannot be construed as any kind of express alteration of Bergman's at-will relationship with WBH. An alleged "promise" that Bergman could remain at WBH as a "breaker" after her surgery does not change the circumstances under which WBH was permitted to terminate Bergman as an at-will employee. She therefore has no breach of contract claim.

█ Nevertheless, Bergman claims that, under the doctrine of promissory estoppel, WBH is liable for terminating Bergman rather than allowing her to take a leave of absence after her surgery and to stay in her current job with the added restrictions. Under Kentucky law, the elements of promissory estoppel are: "(1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee; (3) which does induce such action or forbearance; and (4) injustice can be avoided only by enforcement of the promise." *Res–Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F.Supp.2d 714, 718 (W.D.Ky.2001). The Kentucky Court of Appeals has noted that "[p]romises by employers to provide certain fringe benefits" will give rise to promissory estoppel. *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 12 (Ky.App. 1990).

The only "promise" that appears in the record is Hayes's statement about the "breaker" position. Arguably, Bergman may also have been under the impression that she would be permitted to take leave following surgery. Even assuming that both these facts amount to "promises," the evidence simply cannot be stretched to suggest that such "promises" by WBH induced Bergman to follow a particular course of action to her detriment. Bergman scheduled her surgery before speaking with anyone at WBH, and WBH informed Bergman prior to her surgery that it could not accommodate her restrictions and would have to terminate her. In fact, Hayes called Bergman at home the evening of August 7 and told her that they needed to meet the next day before the surgery. The facts show that Bergman had already decided to have the surgery before speaking with WBH about her options. Thus, there is no evidence that WBH made any promises to Bergman that it could reasonably have expected to or that did in fact induce any action on her part.

Moreover, Bergman cannot show detrimental reliance. Bergman admitted that she would have had the surgery and followed the doctor's restrictions regardless of what anyone at WBH told her. If she did not, she believed she would have lost her baby. She did not reconsider having her surgery when told that she would be terminated. The facts do not show that she was induced to have surgery by any statement of WBH, and she cannot now claim that injustice can be avoided only by enforcement of the alleged "promise." Bergman therefore cannot prove a claim of promissory estoppel.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Defendant has moved for summary judgment. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for summary judgment is SUSTAINED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

This is a final order.